IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

v.

EVERETT WESCOTT,                          Case No.:  22-cr-98-wmc

Defendant.

UNITED STATES' SENTENCING MEMORANDUM

The defendant appears before this Court after pleading guilty to Count 2 of the indictment, which charges him with sexually exploiting Minor A by filming videos of himself having sexual intercourse with her. (Indictment, R. 2.) The offense of conviction, standing alone, is a serious offense that warrants a significant sentence. However, in light of Minor A's particular vulnerabilities and the defendant's other relevant sexual abuse of Minor A, the government asserts that a sentence above the mandatory-minimum penalty is appropriate, and recommends a sentence between 20 and 22 years' imprisonment.

      **I.**     **FACTUAL BACKGROUND**

Minor A met the defendant and his wife when Minor A was 10 years old. (Pre-sentence investigation report, R. 66, ¶¶ 15, 33.) He and his wife were introduced to Minor A as people who could act as a "big brother and big sister" to Minor A, and help her navigate bullying at school. (*Id.*, ¶¶ 11, 43.) Both believed Minor A to be neglected at home, and so they frequently brought her from Illinois to their home in Wisconsin in

order to spend time with her. (*Id.*, ¶¶ 15, 33.) When the defendant and his wife did spend time at Minor A's home, they helped Minor A with chores or assisted Minor's A mother, who was largely bedridden due to medical issues. (*Id.*, ¶¶ 33, 43.) Minor A grew particularly close to the defendant because he, like Minor A, had struggled with self-harm, suicidal ideations, and mental health as a child. (*Id.*, ¶¶ 15, 23, 101.) The defendant also knew that Minor A had been sexually abused by an adult male when she was much younger. (*Id.*, ¶¶ 9, 15.)

The defendant and his wife assumed such a dominant role in Minor A's life that they attempted to gain custody of her in fall 2021, when Minor A was 15 years old. (*Id.*, ¶¶ 9-13.) After he and his wife unsuccessfully attempted to have Minor A removed from her mother's home, Minor A's mother forbade contact between them and Minor A—a directive that upset Minor A. (*Id.*, ¶ 13.) Only after Minor A's mother located a diary[1] and questioned Minor A about its content did Minor A reveal the defendant's years' long sexual exploitation of her. (*Id.*, ¶¶ 13-15.)

The defendant first exploited Minor A when she was just 12 years old, after suggesting anal sex as mechanism to cope with her urges to self-harm. (*Id.*, ¶ 15.) The defendant, then 27, had sexual intercourse with her in the basement of his home, after

---

[1] On September 14, 2023, undersigned counsel provided U.S. Probation Officer John Pick and defense counsel with scans from Minor A's diary, which was taken as evidence by the Beloit Police Department and later the FBI. The contents of this diary were briefly summarized in the PSR, and select pages are attached as a sealed exhibit. (R. 66, ¶ 66; Exhibit 1.) Minor A has not provided a written victim impact statement and is not expected to speak at sentencing. In absence of that statement, these pages best demonstrate the impact of the defendant's sexual exploitation of Minor A at the time it occurred.

2

which Minor A cried and cocooned herself in a blanket. (*Id.*, ¶ 17.) He continued his sexual exploitation of her until she was 15; at times, he included his wife in the sexual activity, and once brought Minor A to the Wisconsin Dells where he had sexual intercourse with her multiple times. (*Id.*, ¶ ¶ 18–20, 36, 37, 44.) The defendant also utilized a cellphone[2] to record himself having sexual intercourse with Minor A at his home. (*Id.*, ¶¶ 28, 38.) Throughout the course of his sexual relationship with Minor A, he maintained contact with her through social media platforms and encouraged Minor A to keep their communications private. (*Id.*, ¶ 28.)

Minor A also detailed instances wherein the defendant both threatened and used violence to coerce her into sexual intercourse. (*Id.*, ¶¶ 23, 24, 27.) He also threatened to kill himself if she should leave him, or if she expressed doubts about their relationship. (*Id.*, ¶¶ 21-25.) In addition to this emotional and physical coercion, the defendant also led Minor A and his wife to believe his need for sex was the result of having multiple personalities, and that each of them was in a separate relationship with one of his personalities. (*Id.*, ¶¶ 23, 36, 42—44.) Minor A, who grew up in a religious household, believed herself to be in a consensual relationship with the defendant and the defendant was meant to be her husband because he took her virginity. (*Id.*, ¶ 25.) In hindsight, Minor A stated in her forensic interview that it was easy for the defendant to "guilt trip some naïve, innocent girl" into having sex with him. (*Id.*, ¶23.)

---

[2] The defendant ultimately wiped this cellphone of its content and provided it to his wife. (R. 66, ¶ 38.) FBI recovered this cellphone from the defendant's wife, but did not locate any of the videos Minor A described.

In his interview with FBI, the defendant corroborated a substantial portion of Minor A's allegations. He admitted to having sexual intercourse with Minor A on many occasions—to include a threesome with his wife—and that he had feared "winding up in prison" and getting Minor A pregnant. (*Id.*, ¶¶ 34-37.) He also acknowledged that sexual contact with a girl of 12 to 14 years old was inappropriate, and that he wanted to apologize to Minor A for "what he put her through," since she was not old enough or ready. (*Id.*, ¶ 37.) The defendant told FBI agents that he had multiple personalities,[3] and

---

[3] The PSR includes two new statements from the defendant about his mental health. First, the PSR details that during his interview with U.S. Probation Officer John Pick, the defendant stated he saw someone sitting next to him who he knew was not actually in the room. (R. 66, ¶ 99.) Second, the defendant expressed to Mr. Pick that the defendant believed his mental health contributed to his criminal conduct in this case. (*Id.*, ¶ 102.) However, the defendant also "stressed that he regrets what he has done to the victim in this case and to his family and friends, and he needs to improve." (*Id.*)

To extent that this information could give this Court pause with respect to proceeding forward with sentencing, the government asserts that there is no basis for either a mental competency evaluation or an evaluation to determine whether the defendant could assert the affirmative defense of insanity. *See* 18 U.S.C. § 4241 (mental competency) and § 17 (insanity). Defense counsel did request such evaluations during the pendency of this case, nor has counsel moved for such evaluations in response to this information in the PSR. Because defense counsel is in the best position to evaluate whether such evaluations are appropriate, the government assumes that the decision not to seek them is a tactical decision made after consulting the defendant.

Furthermore, the government has no reason to believe, based on the record in this case and all available evidence, that the defendant is incompetent to proceed with sentencing or would qualify for a plea of insanity. Notably, the presence of a mental illness does not render someone incompetent; rather, the central inquiry is whether a mental illness renders a person incompetent "*to the extent* that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a)(emphasis added). At the plea hearing, the Court engaged in a thorough colloquy with the defendant about mental illness and his ability to understand both the charges against him and the proceedings. The defendant unequivocally affirmed his understanding, and that he was both guilty of and wished to plead guilty to Count 2 of the indictment.

Similarly, there is no reason to believe a basis for a NGI defense exists given that the defendant has repeatedly demonstrated clear appreciation of the nature and quality or the wrongfulness of his acts. *See* 18 U.S.C. § 17. Both in his interview with law enforcement and Mr. Pick, the defendant made statements that clearly show his appreciation that the nature of his actions was criminal, and that his actions were inappropriate and caused harm to Minor A. (R. 66, ¶¶ 37, 102.)

detailed one instance in which his personality "Kain" forced his wife to watch him have sexual intercourse with Minor A by threatening violence. (*Id.*, ¶¶ 32, 36.) Notably, the defendant has never been diagnosed with a disorder that would result in multiple personalities, nor has he sought treatment to address this self-diagnosis. (*Id.*, ¶¶ 98-103.)

## II.  ADVISORY GUIDELINES

The offense of conviction carries a mandatory minimum term of imprisonment of 15 years, and a maximum penalty of 30 years imprisonment. (R. 66, ¶ 120.) The Court must also impose at least 5 years of supervised release, and may impose up to a lifetime term. (*Id.*, ¶ 125.)

In calculating the advisory guideline range of imprisonment, the PSR uses a total offense level of 43 and criminal history category of I. (*Id.*, ¶ 121.) This yields a guideline of life imprisonment. (*Id.*) However, because this guideline exceeds the statutorily authorized maximum penalty of 30 years, the applicable guideline range in this case is limited to 360 months' imprisonment. (*Id.*)  The guideline range of supervised release is 5 years to life. (*Id.*, ¶ 125.)

The defendant did not object to the PSR, or offer any factual clarifications or additions. (Addendum to PSR, R. 68.) The government objected to the PSR's application of USSG § 2G2.1(b)(6)(B) in the calculation of the offense level, which resulted in a two-level increase. (Government's response to the PSR, R. 67.) The PSR writer disagreed, and maintains that this enhancement applies. (R. 68.) However, even without the

5

application of this enhancement, the advisory guideline range of imprisonment of 360 months remains the same. (*Id.*)

### III. SENTENCING ARGUMENT

#### a. <u>Nature, circumstances, and seriousness of the offense</u>

Although all crimes involving the sexual exploitation of children should be considered serious—as evidenced by Congress's decision to attach lengthy mandatory minimum penalties to many crimes that fall within this category—this Court should find the defendant's conduct in this case especially serious for three reasons.

First, Minor A was a particularly vulnerable victim. Even before the defendant entered her life, Minor A had suffered sexual abuse and neglect by adults, to include family. She struggled with bullying, her mental health, and destructive self-harm. Entries from Minor A's diary paint the additional confusion, angst, and pain the defendant's actions created for this already vulnerable child. She writes that she doesn't want to have sex anymore, and that she is a "horrid girlfriend" and expresses that she has to focus on the defendant or she will "lose" him. (Exhibit 1, p. 1.) She writes that she knows that she'll end up "killing myself," and that the defendant knows it to. (*Id.*) She describes herself as a small, weak, and helpless, and writes that she deserves to be abused and hurt. (Ex. 1, p. 2.) She writes that she is meant to "serve" the defendant until she is unneeded, and must stay loyal to him "like the dog I am." (*Id.*) The emotional impact of the defendant's actions is something Minor A will carry with her for the rest of her life, in addition to the other trauma and pain Minor A experienced in her childhood.

Second, the defendant's close, fatherly relationship with Minor A rendered her vulnerable to him, and he abused the important position he held in her life. He and his wife were meant to be role models and trusted family figures for her. And yet, he used that relationship to perpetrate horrendous sexual crimes against her and convince Minor A that his conduct was both normal and loving. He further used his own struggles with mental health to manipulate Minor A into engaging in repeated sexual conduct with him, all while knowing a true father-figure would never do this. Minor A should have been cared for and supported by the defendant; instead, she became an object he used to satisfy his own sexual gratification. Minor A's belief that she was "dating" the defendant, and his wife's description of Minor A as an "active" participant in sexual contact with the defendant, only underscore how effectively he manipulated and exploited Minor A. (R. 66, ¶ 44.)

Third, the defendant's sexual exploitation of Minor A includes other conduct beyond the conduct charged in Count 2 of the indictment. His abuse of her was years-long, and extended beyond the confines of one occasion or one place. While the defendant did not further distribute the videos he produced to others, he actively involved a second adult—his wife—in his sexual abuse Minor A.

### b. History and characteristics of the defendant

The defendant does not present without some mitigating personal history and characteristics. Chief amongst these is his lack of criminal history and long-term struggle with depression, suicide, and his self-proclaimed personality disorder. (R. 66, ¶¶ 98-108.) However, he has not sought treatment or help in response to his mental

7

health struggles. Instead, the defendant consistently turned to drugs to cope and "escape" his problems. (*Id.*, ¶ 108.) Although he denies any substance abuse or addiction, he has persistently used some form of recreation drug since the age of 16, to include daily use of marijuana; a substantial period of cocaine use; and the use of hallucinogenic mushrooms from the age of 27 until his detention in this case. (*Id.*, ¶¶ 105-108.) Nothing in the defendant's personal history suggests that he is capable or willing to address these underlying concerns, which he vaguely cites as contributing to his criminal conduct in this case. (*Id.*, ¶¶ 100-103, 108.)

    c. <u>Need to protect the public, provide just punishment, and achieve parity</u>

A sentence between 20 and 22 years provides just and proportionate punishment, and also serves to protect the public at large—most importantly, other children. This sentence also protects Minor A, who must be given an opportunity to heal and thrive without fearing she will cross paths with the defendant.

Finally, a sentence of this length achieves parity with other similarly situated defendants who have been sentenced by this Court. In cases of child exploitation that involve children personally known to the defendant, this Court has previously imposed sentences above the 15-year mandatory minimum. In *United States v. Timothy P. McDowell*, 2021CR0117, this Court imposed a 25-year sentence after the defendant pled guilty to a violation of Title 18, U.S.C. § 2251(a). There, McDowell photographed himself sexually abusing two extremely young children with whom he had a familiar

8

relationship, and distributed the photographs on the Internet.[4] In *United States v. James C. Gibson*, 2022CR0082, this Court imposed an 18-year sentence after the defendant pled guilty to a violation of Title 18 U.S.C. § 2251(a). In that case, Gibson exploited two children known to him by taking sexually explicit photographs of them and maintaining an inappropriate relationship with them.[5] While no two cases present identical fact patterns or identically situated defendants, these two cases are similar to this case to the extent that the defendant also victimized a child with whom he had a personal relationship. The government asserts that a sentence between 20- and 22-years' imprisonment avoids a sentencing disparity while still considering the specific circumstances of this case.

---

[4] This information is from the publicly available plea agreement, filed in that case as R. 30.

[5] This information is from the publicly available plea agreement, filed in that case as R. 26.

IV. CONCLUSION

For the reasons addressed above, and in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), the government respectfully requests that this Court impose a sentence between 20-and 22- years' imprisonment, to be followed 15 years of supervised release.

Dated September 16, 2023.

Respectfully submitted,

TIMOTHY M. O'SHEA
United States Attorney

By:
    /s/
TAYLOR L. KRAUS
Assistant United States Attorney